IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICIA ELAINE RELIFORD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-1850 |
| | § | |
| CAROLYN W. COLVIN,[1] | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION**

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Cross-Motion for Summary Judgment (Doc. 12). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for

---

[1] Michael Astrue was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position. Carolyn W. Colvin is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant. See Fed. R. Civ. P. 25(d).

[2] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Docs. 7, 9, 10.

disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act ("the Act").

## A.  __Medical History__[3]

Plaintiff was born on February 9, 1959, and was forty-six years old on the date of the alleged onset of disability.[4] Plaintiff has a high school education and worked as a bookkeeper until January 31, 2006.[5]

### 1.  Physical

Prior to 2009, Plaintiff had been diagnosed with diabetes mellitus ("diabetes") and hypertension and continued to receive medical treatment for those conditions through 2009.[6]

In April 2009, Plaintiff saw Shelley D. Manning, M.D., ("Dr. Manning") for a disease management followup.[7]  Dr. Manning noted

---

[3]     Prior to the current application, Plaintiff had received an unfavorable disability decision from an ALJ.  See Tr. of the Admin. Proceedings ("Tr.") 8, 130-33.  Shortly after the Appeals Council denied review of the ALJ's decision, Plaintiff filed the current application.  See Tr. 8, 110, 147.  The ALJ noted at the hearing on the current application that Plaintiff's administrative onset date was March 12, 2009, the day after the ALJ issued the prior unfavorable opinion.  See Tr. 8.  Plaintiff's attorney agreed with the ALJ.  See id.

The prior decision covered the period January 31, 2006, to March 11, 2009, and cannot be reviewed under the guise of a new application.  In order to qualify for benefits, a plaintiff must establish that she became disabled prior to the date last insured within the meaning of the statutes and regulations.  Carey v. Apfel, 230 F.3d 131, 134 (5th Cir. 2000); see also 42 U.S.C. §§ 416(i)(3), 423(c)(1); 20 C.F.R. §§ 404.130-404.132.  Plaintiff, in this case, was insured through December 31, 2009.  See Tr. 8, 146, 168, 187.  Because of these limitations, the court confines its review of the medical record to evidence that bears upon Plaintiff's ability to work between March 12, 2009, and December 31, 2009.

[4]     See Tr. 8, 110, 114, 146, 168, 187.

[5]     See Tr. 10, 22, 151, 156.

[6]     See Tr. 236, 242-43, 259, 338.

[7]     See Tr. 258-60.

that Plaintiff was not taking any medications at the time, was smoking one pack of cigarettes a day, and was complaining of a cough and pain in her abdomen, left foot, and left hip.[8]   The doctor also noted that Plaintiff walked with a cane.[9]   After examination, Dr. Manning listed Plaintiff's diagnoses as esophageal reflux, hypertension, asthma, diabetes, stomach pain, foot pain, left hip pain, tobacco use disorder, and depression.[10]   The doctor ordered x-rays, laboratory tests, and consultations with ophthalmology, podiatry, and psychiatry.[11]   Furthermore, Dr. Manning advised Plaintiff to stop smoking and to restart her medications.[12]

Michael Z. Metzger, D.P.M., ("Dr. Metzger") saw Plaintiff a few days later regarding her foot pain.[13]   Plaintiff reported her medications as Metformin for diabetes, Advair and Proventil for asthma, Benzonatate for coughing, Flunisolide for sinus problems, Hydrochlorothiazide and Lisinopril for high blood pressure, Tramadol for pain, Naproxen for inflammation, Trazodone and Citalopram (Celexa) for depression, Famotidine for an ulcer, and Protonix for a hiatal hernia.[14]   Dr. Metzger ordered the debridement

---

[8]   See Tr. 259.

[9]   See id.

[10]   See id.

[11]   See Tr. 260.

[12]   See id.

[13]   See Tr. 257-58.

[14]   See id.

of the nail on Plaintiff's right big toe, prescribed an antifungal medication, and ordered a magnetic resonance imaging ("MRI") and x-rays of Plaintiff's left foot.[15]

The record contains two reports from x-rays of Plaintiff's left foot taken in April 2009.[16] The first report is dated April 13, 2009, and showed scattered mild degenerative changes, soft tissue swelling, an osteophyte, and a bunion.[17] No fractures or dislocations were observed.[18] According to the second x-ray performed on April 21, 2009, Plaintiff suffered from hypertrophic degenerative changes and small osteophytes.[19] Again, no fractures or dislocations were observed.[20] The joint spaces were preserved; the soft tissues were unremarkable; and the bones were well mineralized without lesions.[21]

A hip x-ray taken about the same time revealed degenerative changes of both hips with moderate joint space narrowing on the left and mild joint space narrowing on the right.[22] No fractures

---

[15]    See Tr. 258.

[16]    See Tr. 270, 273.

[17]    See Tr. 273.

[18]    See id.

[19]    See Tr. 270.

[20]    See id.

[21]    See id.

[22]    See Tr. 274.

or dislocations were observed.[23]

Dr. Manning saw Plaintiff in late June and noted back tenderness, among other issues.[24] Plaintiff walked with a cane and reported that her blood sugar and blood pressure had been high.[25] Dr. Manning referred Plaintiff to other health providers for evaluation concerning diabetes, rheumatology, ophthalmology, podiatry, and psychology.[26]   The doctor increased Plaintiff's medication for diabetes and advised Plaintiff to stop smoking.[27]

Plaintiff saw Dr. Metzger in July 2009, and he shared with Plaintiff the results of the foot MRI, which revealed a small cyst, joint effusion with synovitis, and scattered degenerative changes in the joints and bones.[28] Plaintiff's medications were mostly the same except she was no longer taking Benzonatate, Naproxen, or Trazadone and had added Bupropion (Wellbutrin) for depression and Zolpidem (Ambien) for insomnia.[29] Plaintiff reported ankle pain and numb toes.[30]   Dr. Metzger noted, "dm running a little high: has

---

[23]      See id.

[24]      See Tr. 253-54.

[25]      See Tr. 253.

[26]      See Tr. 254.

[27]      See id.

[28]      See Tr. 230-31, 250-52.

[29]      See Tr. 251.

[30]      See Tr. 250.

infection now," apparently referring to high blood sugar.[31]  Dr. Metzger ordered another nail debridement and x-rays of the ankle, the latter of which revealed no acute bony abnormalities and a preserved mortise, although a bony fragment, possibly related to an old trauma, and soft tissue calcifications were detected.[32]  Dr. Metzger put Plaintiff on the list for the next available ankle support.[33]

Alan D. Croock, M.D., ("Dr. Croock") evaluated Plaintiff in July 2009 on a rheumatology consult.[34]  Plaintiff reported that she had experienced pain in her lower back for more than thirty years, but the intensity had increased over the last four years.[35]  She also reported pain around her left hip and both knees for many years.[36]  Plaintiff reported occasionally walking for exercise, and Dr. Croock observed her ambulation to be stable with a cane, which Plaintiff explained had been her late husband's.[37]

Dr. Croock examined Plaintiff and noted, among other observations, no joint swelling or weakness and no signs of trunk

---

[31]    See id.

[32]    See Tr. 227-30, 252.

[33]    See Tr. 252.

[34]    See Tr. 247-50.

[35]    See Tr. 247.

[36]    See id.

[37]    See 247, 248.

or extremity inflammation.[38]  Plaintiff's muscle strength was 5/5.[39]
Dr. Croock listed Plaintiff's diagnoses as chronic lower back pain,
degenerative joint disease of the back and hip, osteoarthritis of
the ankle and foot, obesity, and bilateral knee pain.[40]

He found Plaintiff to be clinically stable but counseled her
on exercise, weight reduction, and smoking cessation, as well as
compliance with medications, therapy, and medical appointments.[41]
He recommended vitamins and a healthy diet.[42]  In addition to
laboratory tests and a physical therapy consult, Dr. Croock ordered
x-rays of Plaintiff's knees and spine on suspicion of degenerative
joint disease.[43]

The x-ray of the right knee showed "[s]ymmetric mild medial
compartment joint space narrowing," and the x-ray of the left knee
showed "[s]ymmetric mild degenerative arthropathy."[44]  The x-ray of
Plaintiff's spine revealed "[m]ultilevel degenerative changes of
the thoracic and lumbar spine."[45]  Specifically, Plaintiff was
suffering from severe degenerative disease from T10 through T12,

---

[38]    See Tr. 248, 249.

[39]    See Tr. 249.

[40]    See id.

[41]    See id.

[42]    See 250.

[43]    See Tr. 224-27, 250.

[44]    Tr. 225, 226.

[45]    Tr. 261.

7

"[m]ild to moderate degenerative disease of the lumbar spine manifested by disc space narrowing and anterior osteophytosis," "[m]oderate facet hypertrophy of the lumbar spine, most pronounced from L3 through S1," "[w]edging of the T9 vertebral body, likely physiological."[46]  The spine x-ray showed no evidence of displaced fracture.[47]

Plaintiff was transported via ambulance to Ben Taub General Hospital ("Ben Taub") in July 2009 after several days of abdominal pain, nausea, and vomiting.[48]  In response to questions regarding her past medical history, Plaintiff indicated that she had been diagnosed with chronic obstructive pulmonary disease ("COPD") in 2004.[49]  Her glucose level while at the emergency room was 335 mg/dl, but there was no indication in the notes that the episode was related to diabetes.[50]  Plaintiff was treated and released with instructions to followup at a community clinic a month later.[51]

In early September, Plaintiff was seen by Dr. Metzger for treatment of the cyst on her left foot.[52]   In addition to

---

[46]   Id.

[47]   See id.

[48]   See Tr. 233-39.

[49]   See 238.

[50]   See Tr. 233-39.  In a disability report completed near the time of her second application, Plaintiff indicated that the visit was due to stress and dehydration.  See 154.

[51]   See Tr. 234.

[52]   See Tr. 242.

Plaintiff's medications for diabetes, asthma, sinus problems, high blood pressure, and pain, Plaintiff was taking Zolpidem for insomnia.[53]  Dr. Metzger was unable to aspirate the cyst.[54]

At a follow-up appointment with Plaintiff on September 9, 2009, Dr. Manning listed Plaintiff's diagnoses as foot pain, ganglion cyst, chronic lower back pain, osteoarthritis of the ankle and foot, degenerative joint disease of the lumbroscral and hip regions, depressed mood, hypertension, and asthma.[55]  Dr. Manning increased Plaintiff's dosage of Metformin, finding that diabetes was not being controlled.[56]

On the same day as the appointment, Dr. Manning assessed Plaintiff's residual functional capacity ("RFC").[57]  Dr. Manning estimated that Plaintiff experienced both pain and fatigue in the moderate range and noted that the pain was not completely relieved by Plaintiff's medications.[58]  In the doctor's opinion, Plaintiff could sit no more than two hours and stand/walk less than one hour in an eight-hour day, could never lift/carry anything over five pounds and could lift/carry less than five pounds occasionally.[59]

---

[53]   See Tr. 243.

[54]   See id.

[55]   See Tr. 338.

[56]   See id.

[57]   See Tr. 444-49.

[58]   See Tr. 445.

[59]   See Tr. 445-46.

Plaintiff's symptoms, one of which was constant pain, were likely to increase in a competitive work environment, in Dr. Manning's opinion, and Plaintiff was likely to experience "good days" and "bad days."[60] Dr. Manning indicated that pain, fatigue, or other symptoms constantly would interfere with Plaintiff's attention and concentration.[61]

Although Dr. Manning believed that Plaintiff's impairments would last at least twelve months, Dr. Manning did not find that emotional factors contributed to the severity of her symptoms or functional limitations.[62] Dr. Manning indicated that Plaintiff was capable of low work stress but would need to take two or three fifteen-to-twenty-minute breaks every day.[63] Plaintiff's impairments, according to Dr. Manning, were likely to produce good days and bad days.[64] Dr. Manning indicated that Plaintiff needed to avoid wetness, gases, dust, heights, fumes, humidity, and extreme temperatures and could not bend, pull, stoop, push, or kneel.[65]

Dr. Manning listed Plaintiff's medications: Metformin, Advair,

---

[60]   See Tr. 448, 449.

[61]   See id.

[62]   See id.

[63]   See Tr. 448-49.

[64]   See Tr. 449.

[65]   See id.

Proventil, Loratadine (for allergies), Hydrochlorothiazide, Lisinopril, Citalopram, Bupropion, Darvocet (for pain), and Protonix.[66]   In late October, Plaintiff reported that her medications were the same except that she was also taking Flunisolide, Zolpidem, and Hydrocodone and had discontinued Darvocet.[67]

### 2. Mental

Over the same period, Plaintiff received psychotherapy.[68] Psychiatrist Stephanie Sim, M.D., ("Dr. Sim") evaluated Plaintiff in May 2009, noting Plaintiff's chief complaints as depression and anxiety over the previous year.[69] Plaintiff described experiencing poor sleep with initial insomnia, low energy and motivation, low concentration, weight gain, isolation, irritability, low interest in grooming, high level of worrying, restlessness, and muscle tension.[70]  Plaintiff stated that she had a history of depression over the prior ten years without hospitalizations or suicidal ideation and that she had responded well to the medication Citalopram.[71]  Plaintiff said she smoked about a pack of cigarettes

---

[66]   See Tr. 446-47.

[67]   See Tr. 283.

[68]   See Tr. 245-47, 252-57.

[69]   See Tr. 256-57.

[70]   See Tr. 256.

[71]   See id.

each day.[72]

The mental status examination had normal results except for depressed mood and blunted affect.[73]  Dr. Sim diagnosed Plaintiff with major depressive disorder recurrent with anxious features and determined her Global Assessment of Functioning ("GAF") to be 52.[74] Dr. Sim prescribed Bupropion and Zolpidem, continued Citalopram, and referred Plaintiff for psychotherapy.[75]

Psychotherapist Chrysaundra M. Simmons ("Ms. Simmons"), evaluated Plaintiff in June 2009.[76]  Plaintiff reported depression, mood swings, and sleep changes.[77]  Ms. Simmons noted that Plaintiff was generally well groomed and goal oriented but manifested an anxious affect and a dysthymic mood.[78]  Ms. Simmons opined that Plaintiff suffered from a mood disorder, grief, a history of substance abuse, and family conflict and determined her GAF to be 55.[79]  The treatment plan included improving coping skills for depression and anxiety and participating in psychotherapy.[80]

---

[72]    See id.

[73]    See id.

[74]    See Tr. 257.

[75]    See id.

[76]    See Tr. 254-56.

[77]    See Tr. 255.

[78]    See id.

[79]    See id.

[80]    See id.

12

Plaintiff saw Ms. Simmons again in late June 2009 and reported continuing to experience depression and anxiety.[81]   Ms. Simmons found a mental status examination to be normal except for an anxious affect and a depressed mood.[82]   She recommended that Plaintiff explore shelter options, improve her self care, improve coping skills for depression, and continue with individual psychotherapy in three weeks.[83]

The medical record contains notes from psychotherapy sessions in July, August, and September 2009 with Ms. Simmons.[84]   The notes do not reflect significant changes in Plaintiff's condition.[85]   In early September, Ms. Simmons noted Plaintiff's affect was appropriate and her mood was euthymic.[86]   In late September, her mood was again euthymic despite her not feeling well that day and demonstrating blunted affect.[87]

Dr. Sim reevaluated Plaintiff on September 21, 2009.[88] Plaintiff reported that she was not sleeping through the night, suffered from low energy, motivation, and concentration, and tended

---

[81]   See Tr. 252.

[82]   See Tr. 253.

[83]   See id.

[84]   See Tr. 245-47, 332.

[85]   See Tr. 242, 245-47, 332.

[86]   See Tr. 242.

[87]   See Tr. 332.

[88]   See Tr. 334-35.

13

to isolate herself.[89]  However, Plaintiff also stated that she was showering, she had lost weight, and her irritability had improved.[90] In regard to anxiety, she reported that she was worried about her children and her finances, experienced restlessness and muscle tension, but that the anxiety had improved and that she had not suffered an anxiety attack.[91]  Dr. Sim listed Plaintiff's diagnoses as major depressive disorder with anxious features and assessed her GAF to be 52.[92]

Plaintiff attended a consultative mental health examination in October 2009.[93]  Cecilia P. Lonnecker, Ph.D., ("Dr. Lonnecker") performed a clinical interview and a mental status examination.[94] Plaintiff provided what Dr. Lonnecker found to be a fairly reliable personal history.[95]  Plaintiff indicated that she was able to prepare meals sometimes, was able to manage money and handle finances, and was able to shop with assistance.[96]  Dr. Lonnecker concluded that Plaintiff suffered from major depressive disorder without psychotic features, that her GAF was 60, and that her

---

[89]   See Tr. 334.

[90]   See id.

[91]   See id.

[92]   See Tr. 335.

[93]   See Tr. 282-87.

[94]   See id.

[95]   See Tr. 282.

[96]   See Tr. 284.

prognosis was fair.[97]

At no point during her 2009 mental health treatment did Plaintiff demonstrate signs of suicidal or homicidal ideation.[98] Plaintiff continued to see Ms. Simmons for psychotherapy into 2010.[99]  The treatment plan in January 2010 was to maintain Plaintiff's mood stability and to decrease symptoms of depression, as well as to improve coping skills and to continue individual psychotherapy.[100]

## B.  Application to Social Security Administration

Plaintiff protectively filed for disability insurance benefits and for supplemental security income for the second time on July 13, 2009, claiming an inability to work due to diabetes, COPD, high blood pressure, foot pain, acid reflux, and arthritis.[101]

In a disability report that Plaintiff completed near the time of her application, Plaintiff stated that she was five-feet-four-inches tall and weighed 218 pounds.[102]  She described the work limitations caused by her medical conditions in this way: "I cannot sit or stand more than 20-30 minutes at a time[; I] have a reaction

---

[97]   See Tr. 286.

[98]   See Tr. 242, 245, 246, 247, 253, 255, 256, 332, 335; but see Tr. 283 (self-reporting to Dr. Lonnecker passive suicidal thoughts without a plan).

[99]   See, e.g., Tr. 326.

[100]   See id.

[101]   See Tr. 34, 41, 110, 114, 146, 150, 151.

[102]   Tr. 150.

when under stress[;] I can't work in extreme temperatures[;] I get depression [sic] very easily."[103]   Explaining why she stopped working in January 2006, Plaintiff stated, "All these things were going on[,] and then[,] with my husband being ill and taking care of my kids, if [I] didn't stop [I] was gonna lose it."[104]   Her medications at the time were Metformin, Advair, Flonase (for asthma), Hydrochlorothiazide, Lisinopril, Tramadol, and Citalopram.[105]   Plaintiff reported no side effects from any of the medications.[106]

She stated that her daily activities included taking care of personal hygiene with minimal assistance, taking her medications, preparing simple meals for breakfast, lunch, and dinner, reading, studying scripture, watching television, going to doctor appointments, caring for her children with the assistance of a friend, and/or grocery shopping and other shopping (in stores or online) as necessary.[107]   According to the report, she also could manage money, could walk, could use public transportation, could ride in a car, could visit with family and friends by telephone,

---

[103]   Tr. 151.

[104]   Id.

[105]   Tr. 155.

[106]   See id.

[107]   See Tr. 158-62.

and sometimes could go out to eat with others.[108]   However, Plaintiff stated that she required assistance in preparing full meals, performing yard and house work, and completing tasks away from the house if she had to carry items.[109]  She did not drive because she did not have a license or car.[110]

With regard to her physical abilities, Plaintiff reported that she could not lift more than five pounds, could not squat, kneel, or bend, could not stand for more than twenty minutes or walk more than a few blocks, could not sit for more than thirty minutes, could not climb stairs, and could not reach above her head.[111] Plaintiff indicated that she walked with the assistance of a cane.[112] She stated that depression made completing tasks difficult and interfered with her concentration.[113]

Leela Reddy, M.D., ("Dr. Reddy") completed a Psychiatric Review Technique in November 2009 based on medical findings related to depression.[114]  Dr. Reddy found that Plaintiff had a medically determinable impairment of major depressive disorder that did not "precisely satisfy the diagnostic criteria" for affective disorders

---

[108]    See Tr. 161-62.

[109]    See Tr. 160-61.

[110]    See Tr. 161.

[111]    See Tr. 163.

[112]    See Tr. 164.

[113]    See Tr. 163.

[114]    See Tr. 298-311.

as described in the listings of the regulations[115] (the "Listings").[116] According to Dr. Reddy, Plaintiff's medical record reflected that she experienced: moderate restriction of activities of daily living; mild limitations in maintaining social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation.[117] Dr. Reddy concluded that Plaintiff's alleged limitations from depression were not fully supported by the medical record.[118]

With regard to Plaintiff's mental RFC, Dr. Reddy determined that Plaintiff was not significantly limited in the areas of remembering locations and work-like procedures, understanding and remembering very short and simple instructions, carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted, making simple work-related decisions, asking simple questions or requesting assistance, maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places or using public transportation, setting realistic

---

[115]   20 C.F.R. Pt. 404, Subpt. P, App. 1.

[116]   <u>See</u> Tr. 301.

[117]   <u>See</u> Tr. 308.

[118]   <u>See</u> Tr. 310.

goals or making plans independently of others.[119]

Dr. Reddy found Plaintiff moderately limited in the areas of understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance and being punctual, completing a normal workday and workweek without interruptions from her psychological symptoms and performing at a consistent pace without unreasonable rest periods, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in the work setting.[120]  Dr. Reddy noted again that Plaintiff's alleged limitations caused by her symptoms were not fully supported by the medical record.[121]

A Physical RFC Assessment completed at about the same time reflects that Plaintiff was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for about six hours in an eight-hour workday, sitting for about six hours in an eight-hour workday, and unlimited pushing or pulling.[122]

---

[119]    See Tr. 320-21.

[120]    See id.

[121]    See Tr. 322.

[122]    See Tr. 313.

James Wright, M.D., ("Dr. Wright"), who completed the assessment, further opined that Plaintiff could climb a ramp or stairs frequently and a ladder, rope or scaffolds occasionally, could balance frequently, could stoop frequently, could kneel frequently, could crouch frequently, and could crawl occasionally.[123]  He cited degenerative joint disease/osteoarthritis and obesity as the basis for her limitations.[124]  No other limitations were found, and Dr. Wright stated that Plaintiff's alleged limitations were not fully supported by the medical record.[125]

In a second disability report in early 2010, Plaintiff reported that her conditions had worsened and her pain was constantly severe.[126]  She reported daily pain in her back and left foot.[127]  Plaintiff indicated that the severe pain prevented her from caring for her personal needs.[128]  She also reported difficulty sleeping.[129]

At that time, her daily activities included taking care of personal hygiene, preparing breakfast and helping her children get ready for school, cleaning house, attending basic college courses,

---

[123]     See Tr. 314.

[124]     See id.

[125]     See Tr. 315-16, 319.

[126]     See Tr. 171.

[127]     See Tr. 186.

[128]     See Tr. 175.

[129]     See Tr. 180.

completing her homework, keeping doctor appointments, washing clothes, preparing dinner, and cleaning the kitchen and the floor with the help of her children.[130]   In other areas, her activities remained the same.[131]

Her physical abilities were stable except that she reported improvements in how much she could lift occasionally and how long she could walk.[132]  Her attention span had increased, according to the report, but her concentration had decreased.[133]   Although Plaintiff again reported no side effects from any of her medications in one section, she stated in another that she was unable to take pain medications when she attended class or went to a doctor appointment because they made her sleepy.[134]

Defendant denied Plaintiff's application at the initial and reconsideration levels.[135]  Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[136]   The ALJ granted Plaintiff's request and conducted a hearing on September 30, 2010.[137]

---

[130]    See Tr. 178, 181.

[131]    See Tr. 182-83.

[132]    Compare Tr. 163 with Tr. 184.

[133]    Compare Tr. 163 with Tr. 184.

[134]    See Tr. 174, 186.

[135]    See Tr. 27-30, 46-49, 52-59, 62-65.

[136]    See Tr. 66-68.

[137]    See Tr. 5-26, 69-72, 76-88, 214.

21

C.   <u>Hearing</u>

Plaintiff and Susan Rapant ("Rapant"), a vocational expert, testified at the hearing.[138]   In September 2010, a matter of days before the hearing, Plaintiff underwent surgery following a heart attack.[139]   Prior to the heart attack, she had never been treated for heart disease.[140]

Plaintiff testified that she quit working in January 2006 because she "had a lot of stress at home, had a sick husband, and there was a lot of stress trying to take care of him, take care of my children and my house."[141]   Plaintiff identified Dr. Manning as Plaintiff's primary care physician who had been treating her since April 2009.[142]   She stated that she had problems with her left shoulder, had osteoarthritis in her left foot, left ankle, and back, and had degenerative joint disease.[143]   Her shoulder pain affected her ability to reach overhead, she said.[144]   She reported that she weighed 190 pounds and suffered from diabetes.[145]

Approximately every two or three months, she claimed, she

---

[138]   <u>See</u> Tr. 5-26.

[139]   <u>See</u> Tr. 11.

[140]   <u>See</u> <u>id.</u>

[141]   Tr. 10.

[142]   Tr. 20.

[143]   Tr. 12.

[144]   Tr. 15.

[145]   Tr. 12, 14.

experienced an episode of dizziness, breathing difficulty, and dehydration from which it would take her about a week to recover.[146] She attributed these episodes to COPD, stress, and anxiety.[147] However, she had not received emergency medical treatment for these symptoms since July 2009.[148]

Plaintiff reported that her most recent mental health treatment had been eight months prior to the hearing.[149] The depression caused her to feel "stuck . . . in a rut" and unable to focus, to prioritize, or to decide what to do next and how to do it.[150] Plaintiff estimated that she spent twenty out of thirty days "just stuck."[151] She connected the bad days to situational stress, most recently, family stress due to an allegation of sexual abuse that caused her to lose custody of her children a month before the hearing.[152]

During the course of a normal day, Plaintiff stated, she read, took care of housework as she was able, and took care of the needs of her two teenagers.[153] She reported that she spent no more than

---

[146]   See Tr. 18-19.

[147]   Tr. 19.

[148]   See Tr. 18-19.

[149]   Tr. 13-14.

[150]   Tr. 15.

[151]   Tr. 16.

[152]   Id.

[153]   Tr. 12.

an hour or hour and a half on her feet and the rest of the day seated.[154]   After heart surgery, Plaintiff said, she began walking approximately two long city blocks twice a day.[155]

Having reviewed the record and having heard Plaintiff's testimony, Rapant categorized Plaintiff's prior work as a bookkeeper as sedentary and skilled.[156]   The ALJ asked Rapant about vocational opportunities for a hypothetical, right-hand dominant person approaching advanced age with a high school diploma who could stand and walk for two hours out of an eight-hour workday, could sit for six hours out of an eight-hour workday, could lift, carry, push, and pull a maximum of ten pounds, should never use ropes, ladders, or scaffolds, could occasionally engage in "other posturals," and could occasionally reach overhead with her left upper extremity.[157]   The ALJ further limited the hypothetical individual to detailed tasks that were not complex, eliminating rate, pace, or assembly-line work.[158]   Rapant responded that the hypothetical person could perform Plaintiff's prior work as a bookkeeper.[159]

---

[154]   Tr. 14.

[155]   Tr. 21.

[156]   Tr. 22.

[157]   Id.

[158]   Tr. 23.

[159]   Id.

24

The ALJ posed a second hypothetical question in which he added a limitation of performing only simple one-, two-, and three-step tasks, and Rapant responded that such an individual would not be able to perform Plaintiff's prior work.[160]  In a third question, the ALJ asked Rapant to assume an individual described in the first question with the additional limitation of missing three or more workdays out of each month, and Rapant responded that such an individual would not be able to perform Plaintiff's prior work.[161]

**D.   Commissioner's Decision**

On October 26, 2010, the ALJ issued an unfavorable decision.[162] The ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period and that she had multiple impairments (COPD, osteoarthritis, degenerative joint disease, obesity, left shoulder pain, and major depressive disorder) that were severe.[163]  The ALJ specifically noted that, although Plaintiff suffered from diabetes, the disease did not "significantly limit her ability to perform work-related activities" and, thus, was not a severe impairment.[164]

Plaintiff's severe impairments, individually or collectively,

---

[160]   Id.

[161]   Tr. 23-24.

[162]   See Tr. 31-41.

[163]   See Tr. 36.

[164]   See Tr. 37.

did not meet or medically equal any Listing, according to the ALJ.[165]  In particular, the ALJ considered Listing 1.02 (major dysfunction of a joint), Listing 3.02 (chronic pulmonary insufficiency), and Listing 12.04 (mood disorder), providing a detailed analysis of Listing 12.04.[166]

In determining Plaintiff's RFC to perform work-related activities, the ALJ considered the entire record, including the x-rays, MRIs, Dr. Manning's RFC opinion, and the GAF scores.[167]  The ALJ found Plaintiff capable of sedentary work with the following limitations: lifting and/or carrying no more than ten pounds; pushing and/or pulling no more than ten pounds; sitting for six hours or less in an eight-hour workday; standing and/or walking for two hours or less in an eight-hour workday; occasionally reaching overhead with the left upper extremity; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ropes, ladders, or scaffolds; and performing detailed work at an unforced rate.[168]

Although the ALJ found that Plaintiff's medically determinable impairments could cause the alleged symptoms, he did not find her "statements concerning the intensity, persistence and limiting

---

[165]  See Tr. 37-38.

[166]  See id.

[167]  See Tr. 38-41.

[168]  See Tr. 38.

effects of these symptoms" to be credible to the extent they were inconsistent with the ALJ's RFC determination.[169]   The ALJ stated that Plaintiff's testimony was inconsistent with the medical evidence in that "she severely minimize[d] her ability to perform work-related activities."[170]   Relying on the vocational expert's testimony that a hypothetical individual with Plaintiff's RFC limitations would be able to perform her past work as a bookkeeper, the ALJ found Plaintiff not to be disabled.[171]

Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[172] Plaintiff then timely sought judicial review of the decision by this court.

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.   Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.   Legal Standard

---

[169]   Tr. 39.

[170]   Tr. 41.

[171]   See id.

[172]   See Tr. 1-3, 105.

27

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); <u>see also</u> <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520, 416.920.  By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth.  Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999).  If the Commissioner satisfies her step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested.  Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.  Greenspan, 38 F.3d at 236.

## B.  Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id. The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir.

29

1988).   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.   <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).   In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.   <u>Id.</u>

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.   Defendant argues that the decision is legally sound and is supported by substantial evidence.

Plaintiff asserts that the ALJ's decision contains the following errors:

1[] The ALJ erred in finding [P]laintiff's diabetes mellitus and left foot pain not to be "severe."

. . . .

2(a) The ALJ erred in failing to obtain an updated medical opinion of a medical expert as to the medical equivalency of [P]laintiff's combined physical and mental impairments.

2(b) The ALJ erred in failing to consult a medical expert regarding [P]laintiff's RFC in light of [P]laintiff's combined physical and mental impairments.

. . . .

3(a) The ALJ violated Social Security Ruling [("SSR")] 96-6p and erred in not obtaining an updated medical expert opinion concerning the issue of medical equivalence.

3(b) The ALJ's failure to obtain an updated medical

30

expert opinion constitutes the ALJ's failure properly to develop the case.

. . . .

4[] The ALJ summarily rejected evidence favorable to [P]laintiff without conducting a meaningful examination of it or explaining why he was rejecting it.

. . . .

5[] The ALJ erred in not determining whether [P]laintiff could maintain employment.

. . . .

6(a) The ALJ erred in failing to consider [P]laintiff's consistent [GAF] scores, which demonstrate the treating and examining physicians' opinions of [P]laintiff's disability.

. . . .

6(b) The ALJ erred in failing to consider the frequency of psychological treatment.

. . . .

6(c) The ALJ erred in failing to consider the side effects from [P]laintiff's medications on [P]laintiff's ability to work as required by SSR 96-7p and SSR 96-8p.[173]

## A.  <u>Severity of Diabetes and Foot Pain</u>

Plaintiff argues that the record contains multiple notations of elevated blood sugar levels and/or elevated hemoglobin and that the ALJ provided "little, if any articulation" of his rationale for not finding diabetes and foot pain to be severe.[174]   Without a consultative examination or a testifying medical expert at the

---

[173]    Doc. 11, Pl.'s Mot. for Summ J. pp. 4-11.

[174]    <u>Id.</u> pp. 4-5.

31

hearing, Plaintiff contends, the ALJ lacked sufficient record development and could not determine the likely impact of these two impairments.

Defendant responds that the evidence does not reveal any functional limitations caused by diabetes or foot pain that affect her ability to perform work-related activities. Defendant contends that Plaintiff was noncompliant with her diabetes treatment and was able to control her foot pain through anti-inflammatory medications.

Plaintiff's suggestions that the ALJ erred by failing to consult a medical expert at the hearing and by not fully developing the record overlap with other errors raised by Plaintiff and are discussed in greater detail in subsequent sections of this opinion. At this point, the court considers whether the record contains sufficient evidence to support the ALJ's determination that Plaintiff's impairments of diabetes and foot pain were not severe.

At step two of the disability analysis, the ALJ must determine whether the alleged impairments are severe or not severe. See 20 C.F.R. § 404.1520(a)(4)(ii), (c); 20 C.F.R. § 416.920(a)(4)(ii), (c). A severe impairment is one that significantly limits an individual's ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). Basic work activities are those abilities and aptitudes required for most jobs, including, inter alia, walking, sitting, seeing, hearing, and

understanding and carrying out simple instructions.  20 C.F.R. §§ 404.1521(b), 416.921(b).

The Fifth Circuit instructs that an impairment is not severe if it is a "slight abnormality" that has such a "minimal effect on the individual that it would not be expected to interfere with an individual's ability to work, irrespective of age, education or work experience."  Herrera v. Comm'r of Soc. Sec., 406 Fed. App'x 899, 902 n.1 (5th Cir. 2010)(unpublished)(quoting Loza v. Apfel, 219 F.3d 378, 391 (5th Cir. 2000)).

### 1. Diabetes

The ALJ specifically acknowledged that Plaintiff had diabetes but found that it did not significantly limit Plaintiff's ability to perform work-related activities.  The record supports this conclusion. The record contains evidence of diabetes treatment but not functional limitations resulting from the disease.

Plaintiff stopped taking all of her medications sometime in the first quarter of 2009.  In April 2009, Dr. Manning ordered Plaintiff to restart her medications.  In June 2009, in response to laboratory results indicating that the disease was not well controlled, Dr. Manning increased the dosage of Metformin, Plaintiff's medication for diabetes.  In July 2009, when Plaintiff was treated at the Ben Taub emergency room for nausea and vomiting, her blood sugar again was high.  Dr. Manning also increased the Metformin dosage in September 2009.  From the records, it appears

that Plaintiff's diabetes was controlled for the remainder of 2009.

Although her blood sugar registered high on several occasions, Plaintiff has pointed to no record evidence of functional limitations as a result. Absent evidence of significant limitation in the ability to do work-related activities due to diabetes, the court finds that the ALJ's determination is supported by the record.

### 2. Foot Pain

Even though the ALJ did not make a specific finding with regard to foot pain, he considered the medical evidence of foot pain and the resulting limitations. He noted that Plaintiff claimed left foot pain and considered the results of the foot MRI and the ankle and foot x-rays. In determining Plaintiff's RFC, the ALJ took into consideration limitations that may have resulted from her foot pain. In particular, he found Plaintiff capable of sedentary activity with additional limitations on standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, kneeling, crouching, and crawling.

The record contains multiple diagnostic images of Plaintiff's foot but little evidence of impairment. The x-rays of Plaintiff's left foot showed degenerative changes, osteophytes, soft tissue swelling, and a bunion, but no fractures or dislocations. X-rays of the ankle revealed no acute abnormalities. Dr. Metzger, Plaintiff's podiatrist, treated Plaintiff's conditions by

prescribing anti-inflammatory medications and recommending an ankle support upon availability, both rather conservative treatments. At a later visit, Dr. Metzger attempted unsuccessfully to aspirate a cyst, but ordered no further treatment or followup. Physician observations at several appointments indicated that, although Plaintiff used a cane, she was able to ambulate without difficulty.

Irrespective of foot pain, Plaintiff was able to walk, to care for her children, to grocery shop, to use public transportation, and occasionally to dine out of her home. Plaintiff reported more than once that she walked for exercise.

The medical record contains substantial evidence supporting the ALJ's decision that Plaintiff's foot pain caused no more than a minimal effect on her ability to work and, thus, was not severe. Moreover, even if the ALJ's failure to make a specific severity finding with regard to foot pain was an error, it was harmless because he considered related limitations at subsequent steps of the disability analysis.

**B.  <u>Medical Expert</u>**

Several of Plaintiff's arguments touch on the ALJ's failure to utilize a medical expert. Plaintiff complains that the ALJ improperly interpreted raw medical data, that the ALJ did not obtain updated medical expert opinions (at the hearing or before) on severity, equivalency, and RFC and that the ALJ failed to develop the case by not consulting a medical expert.

Defendant responds that the record before the ALJ contained numerous, timely medical opinions, such that the ALJ did not rely on his own interpretation of the medical evidence.  Also, Defendant notes that an ALJ has the discretion to determine whether a medical expert is necessary at the hearing, and, given the amount of record evidence, a testifying medical expert was not necessary in this case.  Defendant further argues that the ALJ met his duty to develop the record and that Plaintiff bears the burden of proving disability.  Moreover, Defendant argues, Plaintiff failed to demonstrate that she could have adduced evidence that might have altered the disability determination and, thus, failed to show prejudice.

**1.  Raw Data**

Plaintiff alleges that, in making his disability determination, the ALJ interpreted the raw medical data on his own instead of properly relying on an expert medical opinion.  To support this argument, Plaintiff relies on two cases for the general principle that an ALJ, as a layperson, should not interpret raw medical data in determining a claimant's RFC.  See Frank v. Barnhart, 326 F.3d 618, 622 (5th Cir. 2003); Manso-Pizzaro v. Sec'y of Health & Human Serv., 76 F.3d 15, 17-19 (1st Cir. 1996).

In Frank, the Fifth Circuit found it inappropriate for the ALJ to have made his own medical conclusions regarding whether certain impairments would cause signs of atrophy or muscle tone loss.

Frank, 326 F.3d at 622.   The court in Manso-Pizzaro noted that "given the illegibility of non-trivial parts of the medical reports, coupled with identifiable diagnoses and symptoms that seem to indicate more than mild impairment, we believe the record alerted the ALJ to the need for expert guidance regarding the extent of the claimant's residual functional capacity to perform her particular past employment." Manso-Pizzaro, 76 F.3d at 19.

The court agrees that an ALJ should not take on the physician's role and draw conclusions from the medical data; however, there is no evidence that the ALJ did so in this case. Plaintiff cites to no specific instance where the ALJ overstepped his bounds in this regard.   Furthermore, the medical record here is clear and contains sufficient treating, examining, and consulting medical providers' interpretations of the raw medical data from which the ALJ could determine Plaintiff's RFC.

## 2. Updated Opinion

Relatedly, Plaintiff further contends that the ALJ should have consulted a medical expert for an updated opinion.   The regulations do not mandate that the ALJ ask for and consider opinions from medical experts.   See 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii); Haywood v. Sullivan, 888 F.2d 1463, 1467-68 (5th Cir. 1989).   Decisions regarding whether a claimant meets or equals a Listing and a claimant's RFC are ultimately reserved to the Commissioner.   See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Soc.

Sec. Ruling 96-5p, 1996 WL 374183, at **2-3, 5 (S.S.A. 1996); Soc. Sec. Ruling 96-6p, 1996 WL 374180, at **3-4.

The signature of a medical or psychological consultant on a disability determination form "ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review" and "must be received into the record as expert opinion evidence and given appropriate weight." Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *3 (S.S.A. 1996).

Substantial evidence supports the ALJ's finding at step three if the plaintiff fails to demonstrate the specified medical criteria. Cf. Selders, 914 F.2d at 619 ("The claimant must provide medical findings that support each of the criteria for the equivalent impairment determination."). When an ALJ finds the impairments are not equivalent in severity to any Listing, the disability determination form satisfies the requirement to receive expert opinion evidence into the record. See Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *3. If an ALJ decides that the symptoms, signs, and laboratory findings reasonably suggest medical equivalence or if an ALJ receives additional medical evidence that he determines may change the consultant's finding on equivalence, then the ALJ must obtain an updated medical opinion. Id. at **3-4.

In Brister v. Apfel, 993 F. Supp. 574, 577 n.2 (S.D. Tex.

38

1998), cited by Plaintiff, the district court rejected an argument similar to the one made by Plaintiff here, noting that the decision whether additional medical evidence requires an updated medical opinion is up to the judgment of the ALJ. An ALJ may ask for the opinion of a medical expert at a hearing, but it is not mandatory. <u>Madis v. Massanari</u>, No. 01-50430, 2001 WL 1485699, at *1 (5th Cir. Nov. 5, 2001)(unpublished); <u>see also</u> 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii).

Here, there is no evidence indicating that Plaintiff's severe impairments or combination of impairments met or equaled an impairment in the Listings. The initial denial determination was issued in November 2009, one month shy of the last date on which Plaintiff was insured.[175] Dr. Wright initially reviewed the file and signed the disability determination form finding Plaintiff not disabled. Although Dr. Wright did not identify which Listings he considered[176] in assessing whether Plaintiff was disabled, the disability determination form does list major depression and degenerative joint disease as the two primary diagnoses considered. The court must assume that the medical consultant looked at the Listings in the process of determining whether Plaintiff was

---

[175]    By the time of the reconsideration decision, in March 2010, Plaintiff's insured status had expired. Even so, Eugenia C. Goodman, M.D., and Michele Chappuis, Ph.D., reviewed the file through December 2009 and found Plaintiff not to be disabled. <u>See</u> Tr. 28-29, 350-52.

[176]    The ALJ specifically noted in the decision that he considered Listings 1.02, 3.02, and 12.04.

disabled.[177]

At the time of the initial determination, Dr. Wright completed a Physical RFC Assessment, and Dr. Reddy completed a Psychiatric Review Technique and a Mental RFC Assessment.   Dr. Reddy specifically found that Plaintiff did not meet Listing 12.04 for affective disorders.   Dr. Reddy also concluded that Plaintiff was not significantly limited in eleven of twenty functional areas and was moderately limited in the other nine.

The court finds that these assessments are particularly timely and relevant.   Plaintiff's suggestion that the ALJ's reliance on them was improper because they were completed substantially prior to the September 2010 hearing and before the 2010 medical evidence was submitted raises absolutely no red flags in this particular case because the window within which Plaintiff needed to prove disability closed on December 31, 2009.

In light of the foregoing, the court finds that the ALJ, having properly relied on and weighed the medical opinions in the complete record before him, acted within his discretion and based his decision on substantial record evidence.   Plaintiff raises no relevant medical evidence not considered by the SSA medical consultants that would have necessitated calling another expert

---

[177]   Plaintiff speaks of "the potential medical equivalency of [P]laintiff's cumulative impairments," suggesting that the combination of her severe impairments could meet a Listing.   Doc. 11, Pl.'s Mot. for Summ. J. p. 5. However, Plaintiff fails to cite a Listing (and the court has not located one) that could be met by combining the impairments identified by the ALJ.

witness to render an updated opinion on medical equivalency, RFC, or any other matter.[178]

### 3. Record Development

Plaintiff contends that the ALJ's failure to consult a medical expert for an updated opinion constituted a failure to develop the case. The Fifth Circuit imposes a duty on the ALJ to fully and fairly develop the facts relating to Plaintiff's claim for disability benefits. Newton v. Apfel, 209 F.3d 448, 458 (5th Cir. 2000). However, reversal of the ALJ's determination is appropriate only if Plaintiff can show prejudice from the ALJ's failure to request additional evidence. Id. Prejudice can be established by "showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision." Id. (quoting Ripley v. Chater, 67 F.3d 552, 577 n.22 (5th Cir. 1995)).

As explained above, the ALJ in this case was not required to obtain an opinion from a medical expert, and the failure to do so is supported by substantial evidence. Thus, the ALJ did not err in failing to develop the case. Moreover, even if the ALJ should have

---

[178] Plaintiff asserts in general terms that consideration of the "cumulative physiological/psychological nexus between [Plaintiff's] disparate mental and physical conditions" is "medically complicated" and required the consultation of a medical expert. Doc. 11, Pl.'s Mot. for Summ. J. p. 6. Plaintiff also asserts that the consultation of an orthopedic medical examiner would have resulted in a different outcome or, at least, "in a much more logically defensible decision." Id. p. 8. The court is not moved by these assertions. As to the first, physicians were consulted in the review process, and, as to the second, Plaintiff fails to indicate what additional evidence an orthopedic consultation would have generated.

obtained an opinion from a medical expert or requested a consultative examination, Plaintiff points to no additional evidence that would have been adduced that could have changed the result. Therefore, Plaintiff has failed in her burden of showing that she was prejudiced by the ALJ's failure to consult a medical expert.

## C.  __Dr. Manning's Opinion__

Plaintiff argues that the ALJ should have given Dr. Manning's RFC assessment deference, and, if the ALJ had, he would have found Plaintiff capable of less than sedentary work. She also contends that the ALJ erred in summarily rejecting Dr. Manning's opinion without a meaningful explanation of his reasons for doing so.

Defendant responds that the ALJ did consider Dr. Manning's opinion but gave it less weight because Dr. Manning's opinion relied heavily on Plaintiff's subjective report of symptoms and limitations and was inconsistent with the medical evidence and Plaintiff's testimony.

The ALJ must evaluate every medical opinion in the record and decide what weight to give each. See 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, the ALJ will give more weight to medical sources who treated the claimant. See 20 C.F.R. §§ 404.1527(c), 416.927(c); Greenspan, 38 F.3d at 237. However, the treating physician's medical opinion is "far from conclusive" and will be given less weight when they are "brief and conclusory, not

42

supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." Greenspan, 38 F.3d at 237; see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Newton, 209 F.3d at 456; Soc. Sec. Ruling 96-6p, 1996 WL 347180, at *3.

When the ALJ does not give a treating physician's opinion controlling weight, he must apply the factors outlined in the regulations to determine the weight to give the opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Among the factors are medical signs and laboratory findings presented in support of the opinion and consistency with the record as a whole. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Engaging in a discussion of these factors is not required unless the ALJ "summarily reject[s] the opinions of [a] treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." Newton, 209 F.3d at 458.

The ALJ in this case outlined Dr. Manning's opinion on Plaintiff's RFC and provided good reasons for the weight given to it, as required by the regulations. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ found that the opinion was inconsistent with the objective medical evidence and with Plaintiff's testimony. The court finds substantial evidence to support the ALJ's opinion. For example, the x-rays and MRIs revealed mild and moderate degenerative changes; the physicians

43

observed Plaintiff's ability to ambulate without difficulty and recommended conservative treatments;[179] and Plaintiff admitted the ability to care for her children, to perform housework, to prepare meals, to shop for groceries, and occasionally to lift ten pounds.

The ALJ also stated that he doubted Dr. Manning's opinion because it appeared that she had "relied quite heavily on the subjective report of symptoms and limitations provided by the claimant[] and seemed to uncritically accept as true most, if not all, of what the claimant reported."[180]

The court finds the ALJ's reasons sufficient for discounting Dr. Manning's opinion concerning Plaintiff's RFC, an issue for which the ALJ has the final responsibility.

**D.  <u>Sustained Employment</u>**

Plaintiff argues that, at step five, the Commissioner must show that Plaintiff was capable of maintaining employment in order to rebut Plaintiff's demonstration of inability to perform her past relevant work.  This argument simply does not apply to the ALJ's decision in this case because the ALJ did not reach step five, finding Plaintiff capable of performing her past relevant work at step four.

Nevertheless, Defendant responds that the medical record

---

[179]    In addition to Dr. Metzger's conservative treatment methods, Dr. Croock referred to Plaintiff as clinically stable and recommended lifestyle changes such as a healthy diet, vitamins, and smoking cessation.

[180]    Tr. 40.

contains no evidence that Plaintiff has an impairment that waxes and wanes and that Plaintiff did not cite to any such evidence. Additionally, Defendant argues that inherent in the ALJ's determination that Plaintiff has the RFC to perform a range of sedentary work is the finding that she could do so on a sustained basis.

In reaching a decision on RFC, the ALJ is required to perform a function-by-function assessment of "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" and to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001)(quoting Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1, *7 (S.S.A. 1996)); see also 20 C.F.R. § 404.1545(b), (c); 20 C.F.R. § 416.945(b), (c). Only if the claimant shows that her physical ailment, by its very nature, waxes and wanes so as to prevent sustained employment will the ALJ need to make a specific finding regarding the ability to maintain employment. Perez v. Barnhart, 415 F.3d 457, 465 (5th Cir. 2005).

Plaintiff does not point to any medical evidence showing that any of her physical ailments, by its very nature, waxes and wanes in its manifestation of disabling symptoms. The only evidence of waxing and waning is in Dr. Manning's RFC assessment, which the ALJ discounted for valid reasons. Even there, though, Dr. Manning

simply answered "yes" to the question whether Plaintiff's "impairments were likely to produce 'good days' and 'bad days'" without giving any specific details or affirming that the symptoms could be disabling in intensity on the "bad days."[181]

In the absence of such evidence, the ALJ's finding that Plaintiff had the RFC to perform her past work as a bookkeeper means that he made the required finding that she could perform the work on a regular and continuing basis. See 20 C.F.R. § 404.1545(b), (c); 20 C.F.R. § 416.945(b), (c); Perez, 415 F.3d at 465. By finding Plaintiff capable of a limited range of sedentary work, the ALJ necessarily considered her ability to perform that work on a sustained basis.

## E. GAF Scores and Psychological Treatment

Plaintiff argues that a consistent GAF score in Plaintiff's range demonstrates that Plaintiff's physicians "obviously believe[d]" that Plaintiff was disabled.[182] Plaintiff also points out that Plaintiff's treatment plan included psychotherapy sessions twice a month, but fails to explain how that affected her ability to work.

Defendant responds that Plaintiff's GAF scores indicate only moderate symptoms, and the ALJ specifically addressed the scores, concluding that they did not support a finding of disabling mental

---

[181]    Tr. 449.

[182]    Doc. 11, Pl.'s Mot. for Summ. J. p. 11.

46

impairment.   With regard to frequent mental health treatment, Defendant agrees that Plaintiff did receive frequent treatment but argues that the medical records indicate that it helped her condition.   The ALJ, Defendant notes, found Plaintiff's major depressive disorder to be a severe impairment and included related limitations in her RFC.

A GAF score between 51–60 is indicative of "moderate symptoms OR any moderate difficulty in social, occupational, or school functioning." <u>Diagnostic & Statistical Manual of Mental Disorders</u> 32 (Am. Psychiatric Ass'n 4th ed. 2000).   On multiple occasions, Plaintiff was assessed with a GAF in that range.   The ALJ specifically noted this fact and its meaning.   The ALJ also noted that Plaintiff's mental status examinations had "confirmed appropriate affect, goal oriented thought processing, alert cognition, and normal thought content without delusions, hallucinations, or suicidal/homicidal ideations."[183]

The fact of the matter is that the ALJ clearly took Plaintiff's mental health into consideration in determining her disability status.   He found her depression to be a severe impairment, discussed information from the psychotherapy progress notes, considered the meaning of the GAF scores, and included in the RFC that Plaintiff was restricted to detailed work at a unforced rate.   Plaintiff disagrees with the ALJ's assessment but

---

[183]    Tr. 40.

has not raised any error on his part or identified ways in which
Plaintiff was totally disabled by her depression.

Plaintiff attended six psychotherapy sessions from the
beginning of June through September 2009.  Other than the
consultative evaluation in October, Plaintiff did not see a mental
health provider through the remainder of 2009.  Moreover, Dr. Reddy
assessed the record at the end of November 2009 and determined that
Plaintiff did not meet a mental health listing and had a mental RFC
that indicated her ability to perform work functions with no more
than moderate difficulty.

The court finds that the ALJ's assessment is supported by
substantial evidence.

**F.  Medication Side Effects**

Plaintiff argues that her prescribed pain medication had known
side effects of drowsiness and/or dizziness.  Defendant responds
that Plaintiff never reported any side effects of her medication.

The regulations state that any side effects of medication
should be considered when reaching a decision on a claimant's
ability to work.  20 C.F.R. §§ 404.1529(c)(3)(iv),
416.929(c)(3)(iv); see also Loza, 291 F.3d at 396-97.  Plaintiff
does not point to any evidence in her medical record to support the
contention that she actually experienced side effects from her
medication, much less that the side effects affected her ability to
work.

The record shows that she never complained of side effects to any provider and that she reported on disability forms that she had none.  Only one mention of drowsiness appears in a form in which she also indicated she experienced no side effects.  The ALJ's determination with regard to medication side effects is well supported by record evidence.

**G.   Summary**

Finding no legal error in the ALJ's decision and finding that substantial record evidence supports his conclusion that Plaintiff is not disabled, the court cannot overturn the decision.

### IV.   Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Cross-Motion for Summary Judgment.

**SIGNED** in Houston, Texas, this 25th  day of April, 2013.

Nancy K. Johnson
United States Magistrate Judge

49